Agnes, A.J.
INTRODUCTION
The defendants are charged with drug offenses arising out of events that took place on August 23, 2002 in the parking lot of Shaw’s Supermarket in Auburn, Massachusetts.[1] They have filed motions to suppress evidence. Based on the credible evidence presented at the hearing on the motions to suppress, I make the following findings of fact and rulings of law.
FINDINGS OF FACT
At approximately 4:30 p.m. on August 23, 2002, Detective Vincent Ross of the Auburn Police Department, a 21-year veteran of the Shrewsbury and Auburn police departments, was conducting surveillance in the parking lot of Shaw’s Supermarket. Although *61 he was not assigned to a drug investigation unit, Detective Ross has had experience in the investigation of drug offenses, has received some specialized training in drug investigations, and has made arrests for drug law violations. He was in an unmarked police cruiser and in plainclothes. His principal purpose was to detect shoplifters due to recent reports of theft by store officials. At some point as he was leaving the area his attention was drawn to an older model vehicle parked near the lot’s exit and backed up against the bank. The nose of the vehicle was facing out toward the parking lot. Two males were seated in the front seat. They appeared to be looking around the parking lot and waiting for someone. Detective Ross moved his vehicle to another location so he could continue to observe this other vehicle. Detective Ross was able to see the vehicle’s registration number on the front license plate and asked his dispatcher to determine who was the vehicle’s owner.
The Auburn police dispatcher informed Detective Ross that the vehicle was owned by defendant Paul Bilodeau (later identified as the driver) from Oxford. The dispatcher also informed him that Bilodeau had been convicted of distribution of marijuana. Detective Ross was suspicious about what the two men might be doing or planning to do. He moved his unmarked cruiser to another location to avoid detection and to give him a vantage point from which to watch Bilodeau’s car.
Shortly thereafter, Detective Ross saw a third male (later identified as defendant Johnathan Peguero) appear. He walked over to Bilodeau’s vehicle. Peguero walked to the driver’s side. Bilodeau reached his arm out of the vehicle and Peguero held his arm straight out and met Bilodeau’s hand. Peguero’s hand never reached inside the vehicle, but it met Bilodeau’s outstretched hand.[2] As soon as the hands met, Peguero turned and walked away. As he did he put the hand that he had extended toward Bilodeau into his pocket. Detective Ross, believing that he had witnessed a drug transaction, called for backup.[3] Meanwhile, the Bilodeau vehicle started up and moved to a parking space close to where Detective Ross was positioned. Detective Ross pulled out and positioned his vehicle behind the Bilodeau vehicle, effectively blocking it in its parking space. He activated his police car’s blue lights and wig wag lights.
As Detective Ross exited his cruiser, he noticed the passenger in the Bilodeau vehicle, defendant Tremblay, getting out of his front passenger seat. Detective Ross identified himself in a loud voice and ordered defendant Tremblay to return to his vehicle.
Detective Ross continued ahead to the driver’s side where defendant Bilodeau was seated. The defendant produced his license and registration in response to a request by Detective Ross. As he stood outside the Bilodeau vehicle, detective Ross observed the comer of a clear plastic bag with the top tied and containing an off-white colored powder on the back seat behind where the Bilodeau was seated. Based on his training and experience, he formed the opinion that the item was a bag of cocaine. Detective Ross proceeded by asking defendant Bilodeau why he was in the parking lot. He told Detective Ross he was dropping someone off to a Patriots football game. When asked about what had happened between him and defendant Peguero a few minutes earlier, defendant Bilodeau said that he (defendant Peguero) had asked him for directions. Detective Ross then asked the passenger-defendant Tremblay for identification. As defendant Tremblay produced some identification, the back-up officers began to arrive. The occupants of the vehicle were ordered to step outside. Detective Ross then retrieved the item he had seen in the back seat. He also observed a Marlboro cigarette package containing two similar bags of what appeared to be cocaine located in between the driver’s seat and front console. See exhibit 1 (3 bags of cocaine) and exhibit 2 (cigarette package).
Robert Gow has been an Auburn Police Officer for 17 years. He responded to Detective Ross’s call for backup on August 23, 2002. He received a communication from Detective Ross to look for a thin, dark-skinned male who had entered the supermarket. Officer Gow saw a man matching the description exit the store while he was still inside his marked police cmiser. He said, “Hold it.” The man, later identified as defendant Peguero stopped. Officer Gow told him that he had some questions. Officer Gow did a pat frisk of Peguero’s outer clothing and felt two objects he could not exclude as potential weapons. He removed them. He did not remove a set of car keys. One item was a cell phone and the other was a wad of United States currency (approximately $3,286.00).
Detective Ross could see the person who had been detained by Officer Gow and recognized him as the man who had walked up to the Bilodeau vehicle a short time earlier. Detective Ross proceeded to the area where officer Gow was holding defendant Peguero. He arrived to find officer Gow holding the cell phone and wad of cash. When asked for identification, defendant Peguero gave the name of “Robero Almanzar.” He produced a license that appeared to have been freshly made and of poor quality. It listed the operator’s weight at 160 pounds which was at least 30 pounds greater than the defendant appeared to weigh. He pointed out a vehicle which he said belonged to him, but the registration plate came back to someone else in with a Worcester address. A drug detecting police dog was brought to the scene and based on an outside inspection of the vehicle reportedly owned by defendant Peguero, it alerted or gave a positive reaction for drugs inside the vehicle. Items were recovered from the vehicle which was taken into custody and towed back to the police station where it was searched again. The three defendants were taken back to the police station and booked.
*62 Defendant Bilodeau was stopped and detained at approximately 4:40 p.m. He was booked and advised of his Miranda rights at the police station by Officer John Kelleher between 5:30 p.m. and 5:50 p.m. See exhibits 6 (copy of Flights form and Miranda card). He made no statement at that time. At approximately 7:30 p.m., while in police custody, defendant Bilodeau stated that he wanted to talk to the police. Officer Bilodeau took him from the cell area to an upstairs office in the police station. The room contains a table and 3 chairs. The defendant was again advised of his Miranda rights. The time was 7:50 p.m. See exhibit 3. The defendant said he understood his rights. He seemed to understand officer Bilodeau and did not appear to be in any distress. The defendant did not appear to be intoxicated or under the influence of any substance. The defendant did not appear to be suffering from any disability. During this initial conversation at the police station, defendant Bilodeau told Detective Ross that there were drugs located inside Peguero’s vehicle. He also admitted to buying 3 bags of drugs from Peguero in the parking lot. He put two bags in the cigarette box for him and his girlfriend, and one was given to defendant Tremblay. Defendant Bilodeau also agreed to give a written statement. However, before the written statement could be produced, Detective Ross was called away by other officers and asked to inspect one of the vehicles that the police had seized.
By the time he returned to defendant Bilodeau, it was about 11:30 p.m. The written statement was begun at 11:35 p.m. and completed at 11:45 p.m. It is handwritten by defendant Bilodeau. See exhibit 4.
RULINGS OF LAW
The defendants advance three arguments in support of their motions to suppress. First, the defendants maintain that Detective Ross lacked justification to block Bilodeau’s motor vehicle and thereby detain its occupants. Second, they maintain that Officer Gow lacked justification for the stop and frisk of defendant Peguero. Third, defendant Bilodeau maintains that his statements, oral and written, to detective Ross should be suppressed based on a violation of the “safe harbor” doctrine.
1. Stop of Bilodeau’s Vehicle
The police have a right to make an investigatory stop of a motor vehicle when they have “a reasonable suspicion, based on specific, articulable facts and reasonable inferences therefrom,” that a vehicle occupant “had committed, was committing, or was about to commit a crime.” Commonwealth v. Alvarado, 427 Mass. 277, 280-81 (1998), quoting Commonwealth v. Alvarado, 423 Mass. 266, 268-69 (1996). See Terry v. Ohio, 392 U.S. 1 (1968). “Reasonable suspicion may not be based on good faith or a hunch, but on specific, articulable facts and inferences that follow from the officer’s experience.” Commonwealth v. Kennedy, 426 Mass. 703, 710-11 (1998).
Detective Ross, an experienced police officer with specific experience in drug investigations, made an observation of what reasonably appeared to be a quick exchange between a person who walked up to the driver of a motor vehicle that had been standing in a supermarket parking lot and the operator. The exchange was not preceded or followed by any conversation, took only moments to accomplish, and did appear to involve the transfer of an item from one to the other. Detective Ross knew that the operator of the vehicle had a prior conviction for a drug offense.
The leading case of this nature is Commonwealth v. Kennedy, 426 Mass. 703, 704-05 (1998), where the Supreme Judicial Court was called upon to assess the sufficiency of the following facts.
At 1 p.m. on August 29, 1994, while parked some forty yards from the intersection in a marked police cruiser and conducting surveillance of the intersection, the officer observed a vehicle pull up and stop at a curb on the comer. Efrain Morales, an individual who had been the basis “of many complaints in the area” and who was known by the police officer to have been arrested previously for narcotics sales, approached the passenger side of the vehicle. Morales leaned down, put his head in the open window, and appeared to exchange words with the driver and sole occupant of the vehicle, who later was determined to be Kennedy. Moments later, Morales ran away, but in approximately one minute, he returned to the vehicle. Morales reached into the vehicle toward Kennedy, while Kennedy reached toward Morales. It appeared to the officer that something was exchanged. Morales then walked away and the vehicle drove off.
Based on his knowledge, education, training and previous experience with those types of sales, the officer believed he had witnessed activities consistent with a narcotics sale, even though he had not seen what had been exchanged. The officer followed and pulled the vehicle over. The officer observed Kennedy to be nervous and fidgety. He ordered Kennedy out of the vehicle, frisked him,(FNl) discovered a small glassine bag containing two rocks of crack cocaine, and arrested him.[4]
On these facts, the Supreme Judicial Court concluded that officer Kennedy had probable cause to believe he had witnessed a drug transaction. Kennedy, supra, 426 Mass, at 710-11. While it maybe said that the facts observed by Detective Ross are consistent with innocent behavior as well as with criminal behavior, that does not render the action taken by the police on the basis of their experience and training as a hunch. See Commonwealth v. Sweezey, 50 Mass.App.Ct. 48, 52 (2000); Commonwealth v. Peters, 48 Mass.App.Ct. 15, 18 (1999).
*63 2. Stop and Frisk of Defendant Peguero
Once Detective Ross saw evidence of drugs in the Bilodeau vehicle, he had probable cause to believe that defendant Peguero had participated in a drug transaction either as the seller or buyer (it makes no difference). Officer Gow had a right to act on the basis of what Detective Ross knew and what he (Officer Gow) observed. Commonwealth v. Placido, 50 Mass.App.Ct. 1114 (2001) (the knowledge of one police officer engaged in a joint undertaking is the knowledge of all).
3. Statements Made by Defendant Bilodeau
The first questioning occurred when Detective Ross approached the Bilodeau vehicle and asked for a license and registration and then followed up with some questions about what he was doing in the parking lot. This initial conversation between Detective Ross and defendant Bilodeau is not governed by the Miranda doctrine. See Commonwealth v. Smith, 35 Mass.App.Ct. 655, 657-58 (1993) (“[I]n the case of motor vehicle accidents, some preliminary questions are permissible to enable the police to orient themselves, and we have not considered that sort of field investigation to establish a custodial environment which triggers the need for Miranda warnings”), and cases cited. Detective Ross’s initial questions were natural, preliminary questions that a motorist would expect to be asked by a police officer. Even though Detective Ross saw what he believed to be drugs in the rear seat area of the car, his questions were not asked under circumstances that qualify as custodial interrogation. See Commonwealth v. Shine, 398 Mass. 641, 649 (1986).[5]
As for the defendant’s statement to detective Ross at about 7:50 p.m., there is no evidence to suggest that the statements were not the product of a rational intellect and that they were not voluntarily made under the totality of the circumstances. Based on the above findings of fact, I rule that the defendant received, understood and validly waived his Miranda rights by a standard of beyond a reasonable doubt.
The remaining question is whether the defendant’s written statement made at approximately 11:30, made about 7 hours after his arrest and a little over 6 hours after he was booked must be suppressed. In a separate order I have reported that question to the Appeals Court. 
ORDER
For the above reasons, the defendants’ motions to suppress are DENIED in all respects except with respect to the statements made by defendant Bilodeau made at approximately 11:30 p.m. which by a separate order I report to the Appeals Court.

One of the issues raised by the defendant Bilodeau’s motion to suppress involves an application of the so-called “safe harbor” mies established in Commonwealth v. Rosario, 422 Mass. 48, 56 (1996). For the reasons set forth in the accompanying Report, I have decided not to decide that question, but instead to report it to the Appeals Court under Mass.R.Ciim.R 34. [Editor’s Note: The Report is reproduced immediately preceding this opinion. See Commonwealth v. Bilodeau, 18 Mass. L. Rptr. 57.)

Detechve Ross initially testified at a hearing conducted by another judge. That hearing was suspended without a conclusion due to scheduling problems. In the hearing before me, all parties agreed that the transcript of Detective Ross’s earlier testimony would be before me as an exhibit along with his live testimony. See exhibit 5. In his earlier testimony, Detective Ross stated that he observed a “quick hand-to-hand exchange made between the operator of the Bilodeau vehicle and the male that walked up.” Exhibit 5 at 17. See also id. at 64. In his testimony before this court, he stated that he observed each man extend his hand out toward the other, and then the man later identified as Mr. Peguero walked away and put his hand in his pocket. These accounts are consistent, I credit them, and I infer from the facts found that an exchange of something small enough to fit in a closed fist occurred between the two men. See Commonwelth v. Kennedy, 426 Mass. 703 (1998) (based on similar evidence, the judge could reasonably infer that the officer observed an exchange of something without being able to see what it was that had been exchanged).

On cross-examination, it was established that during the first hearing Detective Ross stated that his view of the exchange was obstructed by a vehicle between his police cruiser and the Bilodeau vehicle. At the hearing before me Detective Ross indicated that his view of the interaction between Bilodeau and Peguero was not shielded from his view by another vehicle. I credit the testimony that Detective Ross was able to see the exchange between Bilodeau and Peguero regardless of the location of the other vehicle.

In Kennedy, supra, the Court pointed out that the record was thin in terms of details about the process of “inferential reasoning” in which the police officer engaged to make his determination of reasonable suspicion. However, the Supreme Judicial Court noted that “[t]he pattern of street-level drug sales represented by the Kennedy-Morales interaction is not so obscure or remote from the common knowledge of a District Court judge that she could not supplement with her own inferences the officer’s testimony concerning his inferential process in identifying the observed Kennedy-Morales interaction as a drug sale.” Kennedy, 426 Mass, at 706. For that reason I simply note that the behavior observed by Detective Ross is consistent with street level drug transactions as I have heard them described over the past 13 years as a trial judge.

On the record before me, neither the question whether the defendant validly waived his Miranda rights at the scene or later at the police station and whether he made voluntary statements to Detective Ross is a live issue in the case. There is no evidence that the defendant was impaired in any way or subjected to trickery, or physical or psychological coercion. The defendant clearly understood the purpose of the interview and there is no evidence he was intimidated. He said he understood his rights and agreed to speak to the police. Indeed, while at the police station, he requested to speak to Detective Ross.